IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES FIRE INSURANCE )
COMPANY a/s/o MAFCOTE )
INTERNATIONAL, INC., )          Civil Action No. 10-1085
)
    Plaintiff, )          United States Magistrate Judge
)          Cynthia Reed Eddy
    v. )
)
OMNOVA SOLUTIONS, INC., )
)
    Defendant.

## MEMORANDUM OPINION

### I.    INTRODUCTION

Presently before the Court is Defendant's, Omnova Solutions, Inc.'s, ("Omnova") Motion for Post-Trial Relief [ECF No. 101]. For the reasons set forth below, Defendant's motion is denied.

### II.    BACKGROUND

Because the Court writes primarily for the parties, and the facts of the case are well known to them, the Court will only discuss facts pertinent to determine the pending motion. Plaintiff, United States Fire Insurance Company, brought this subrogation action on behalf of its insured, Mafcote International Inc., against Omnova for negligent design and maintenance of a culvert that plaintiff alleged caused extensive flooding at its insured's building after a storm. A jury trial was held from November 5, 2012 to November 9, 2012 and the jury returned a verdict in favor of plaintiff in the amount of $3,400,000. At the close of plaintiff's case-in-chief, defendant moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50,

and for a new trial pursuant to Federal Rule of Civil Procedure 59, which the Court denied. After the jury returned its verdict, plaintiff moved for and was awarded $56,612.32 in prejudgment interest.

Defendant now renews its motion for judgment as a matter of law and/or motion for a new trial, and reconsideration of the prejudgment interest award. Specifically, defendant supplies four arguments as to why his post-trial relief should be granted under Rule 50: (1) defendant "is entitled to judgment notwithstanding the verdict on Plaintiff's negligent design, construction and maintenance theories [because] Plaintiff failed to plead that [defendant] was the mere continuation of the company that designed and constructed the culvert"; (2) "Plaintiff failed to prove that [defendant] was the mere continuation of the company that designed and constructed the culvert"; (3) "Plaintiff failed to prove a causal connection between the culvert's maintenance and the flooding"; and (4) "Plaintiff was not entitled to an award of delay damages because its negligence-based subrogation claims did not seek monetary relief for property damage sustained by Plaintiff." Def.'s Br. in Supp. of Mot. for Post-Trial Relief [ECF No. 113] at 2, 6, 8, 12.

## III. STANDARD OF REVIEW

### a. Federal Rule of Civil Procedure 50(b)

When ruling on a motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), a court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences the jury could have drawn from the evidence. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). A court may only grant a Rule 50(b) motion if there is no rational basis for the jury's verdict. *Id.* "More particularly, a judgment notwithstanding the verdict may be granted under Fed. R. Civ. P. 50(b) only if, as a matter of

2

law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001). Accordingly, a court should grant judgment as a matter of law "sparingly." *Pitts v. Delaware,* 646 F.3d 151, 155 (3d Cir. 2011).

Initially, the Court observes that two of defendant's arguments are not properly within the province of Federal Rule of Civil Procedure 50(b), as they do not challenge the jury's verdict based on the sufficiency of the evidence. The Court will therefore treat defendant's argument that it was error for the Court to allow Plaintiff to offer evidence of successor liability because the theory was not pled in the complaint, and the issue of prejudgment interest as a motion for reconsideration under Federal Rule of Civil Procedure 59(e).

### b. *Federal Rule of Civil Procedure 59*

A motion for reconsideration under Federal Rule of Civil Procedure 59(e) "must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice.'" *Kulesa v. Rex*, 2013 WL 1278451, at \*2 (3d Cir. March 29, 2013) (unpublished) (quoting *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010)).

Because the first two situations do not apply, the Court will address the third. To demonstrate clear error or manifest injustice, the Supreme Court mandates a "definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Moreover, a defendant must "base its motion on arguments that were previously raised but were overlooked by the Court." *United States v. Jasin*, 292 F.Supp.2d 670, 676 (E.D.Pa. 2003). A motion for reconsideration "is not a proper vehicle to merely attempt to convince the court to rethink a

3

decision it has already made[,]" *Colon v. Colonial Intermediate Unit 20*, 443 F.Supp.2d 659, 667 (M.D.Pa. 2006) (citations omitted) and "parties are not free to relitigate issues that the Court has already decided." *Jasin*, 292 F.Supp.2d at 676 (citations omitted). As such, a motion for reconsideration may not be used by an "unsuccessful party to rehash" arguments previously disposed of by the Court. *Keyes v. Nat'l R.R. Passenger Corp.*, 766 F.Supp. 277, 280 (E.D.Pa. 1991).

## IV.   DISCUSSION

### a.   *Successor Liability – Mere Continuation*

Defendant argues that because plaintiff did not plead any successor liability or mere continuation theories in its complaint, it should have been barred from proving that claim at trial. Defendant acknowledges that this issue has already been decided by the court. Defendant moved *in limine* "to exclude at trial evidence of an alleged corporate relationship between General Tire and OMNOVA, or succession of the former by the latter." Def.'s Br. in Supp. of Mot. for Post-Trial Relief [ECF No. 113] at 5. Defendant claims that:

> The Court denied OMNOVA's in limine motion, mistakenly believing that the motion was one for summary judgment, and conclude[ed] that genuine issues of material fact precluded such relief. OMNOVA sought reconsideration of this ruling, explaining that its motion was limited to a request to preclude Plaintiff from offering evidence on a claim it wholly failed to plead[,]

and the Court denied reconsideration. *Id.* Defendant is attempting to rehash arguments that have previously been decided by the Court, and subsequently denied reconsideration. Defendant's arguments simply ask the Court to "rethink what [it] had already thought through rightly or wrongly." *Scarnati v. Soc. Sec.*, 2013 WL 2253159, at *1 (W.D.Pa. May 22, 2013) (quoting *Glendon Energy Co. v. Borough of Glendon*, 836 F.Supp. 1109, 1122 (E.D. Pa. 1993)).

Moreover, while plaintiff's mere continuation theory is not expressly illustrated in its complaint, the Court finds that allowing plaintiff to enter evidence as to the mere continuation theory was not clear error or manifestly unjust. Defendant was not prejudiced because plaintiff's argument relied upon the same set of facts relied upon in the complaint.[1] *See Braccia v. Arlington Capital Mortg. Corp.*, 2009 WL 3756351, at *6 (E.D.Pa. Nov. 9, 2009) (although legal theory was not pled in the complaint, evidence at trial was nonetheless proper because it "resulted in no prejudice to the defendants because the argument relied on the same facts as the theory actually pled in the complaint."). Federal Rule of Civil Procedure 15(b) anticipates and provides for this very issue as it requires the free amendment of pleadings during and after trial "when doing so will aid in presenting the merits" of the case,[2] Fed.R.Civ.P. 15(b), and "no prejudice to the opposing party [will] result." *United States v. Hougham*, 364 U.S. 310, 317 (1960). "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of

---

[1]    Plaintiff's complaint stated in pertinent part: "the defendant, Omnova, **constructed** its property and plant . . . sometime during the 1970s[,]" and that the "completed **construction** narrowed the width of Brush Creek and altered and obstructed its normal water flow[.]" Compl. [ECF No. 1] at ¶¶ 12, 13 (emphasis added). Plaintiff set forth a negligence claim stating that defendant "[f]ailed to properly analyze the potential effects of its construction over and in Brush Creek as it may affect other riparian landowners; [u]tilized improper cubic feet per second calculations in the design and construction of the facility[;] . . . [f]ail[ed] to obtain proper permits for the construction work from the appropriate authorities and construct[ed] the building and retaining walls over and along the stream without proper engineering approval[;] [f]ail[ed] to properly calculate the effects of its construction and fail[ed] to properly evaluate the potential dangerous conditions[.]" *Id.* at ¶ 25. Therefore, defendant was on notice from the time the complaint was filed that the plaintiff sought to proceed on a negligent design and/or construction claim, and as such would have to prove its claim through a successor liability theory. Moreover, over nine months before trial, defendant was on notice that plaintiff sought to proceed on a mere continuation theory, because that issue was the gravamen of defendant's motion in limine. See 2/16/2012 Def.'s Mot. in Limine [ECF No. 30]. Defendant had ample time and opportunity to prepare a defense to the claim and it cannot maintain that it was surprised or unduly prejudiced by plaintiff's mere continuation theory.

[2]    Likewise, Federal Rule of Civil Procedure 15(b)(2) provides for amendment of pleadings during and after a trial and states: "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue." Fed. R. Civ. P. 15(b)(2). While the Court will not opine on the applicability of this rule in the instant matter because no party has argued it, suffice it to say that the Rules compel the free amendment of pleadings at all stages of litigation, including post-trial and post-judgment.

the pleading is to facilitate a proper decision on the merits." *Id.* at 317 (quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957)).

Defendant's arguments have previously been addressed by the Court, and it has not shown that a mistake has been committed, a finding of clear error or manifest injustice. Accordingly, Defendant's motion for reconsideration as to this ground is denied.

### b. *Award of Prejudgment Interest*

Defendant's arguments against prejudgment interest are identical to the arguments already addressed by the Court in the memorandum opinion and order granting prejudgment interest. Defendant does not show that a mistake and been made or that awarding prejudgment interest is a clear error or manifestly unjust. Rather, Defendant merely disagrees with the Court's award of prejudgment interest and asks this Court to re-decide what it has already ruled upon. Accordingly, Defendant's motion for reconsideration on this ground is denied.

### c. *Mere Continuation*

Next, defendant contends that plaintiff failed to prove that it was the mere continuation of the company that designed and constructed the culvert because its witness, Roy May, Omnova's former plant engineer and environmental compliance manager, did not have the requisite knowledge to testify to the creation of Omnova.

To determine whether a transaction is a de facto merger or continuation, the court examines the following factors:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.
>
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the

shareholders of the seller corporation so that they become a
constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations,
liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the
seller ordinarily necessary for the uninterrupted continuation of
normal business operations of the seller corporation.

*Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 468-69 (3d Cir. 2006) (quoting *Philadelphia*

*Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3d Cir. 1985) (applying Pennsylvania law)).

Courts in this circuit have long emphasized that "the second factor – continuity of ownership –

[is the] . . . critical [factor of] . . . a successful successor liability claim under Pennsylvania law."

*Berg Chilling Sys., Inc.*, 435 F.3d at 469 (collecting cases).

Roy May worked at Omnova and its predecessors, General Tire and Rubber Company

and GenCorp for thirty one years. 11/6/2012 Trans. [ECF No. 107] at 107. He testified that

General Tire and Rubber Company "ceased to exist and GenCorp was formed as a holding

company." *Id.* He testified that GenCorp had the same officers, facilities, business, employees,

customers, and was "in the same basic business" as General Tire and Rubber Company. *Id.* at

108. Mr. May testified General Tire and Rubber Company spun off to create GenCorp and at

[t]he changeover from General Tire and Rubber Company to GenCorp, the stock
that had been issued in the name of General Tire and Rubber Company was all
now GenCorp. At the time of the spin-off, essentially, half of GenCorp stayed the
same and the other half became a new company called Omnova, with its own
stock. . . . At the time of the spin-off, the GenCorp, the old GenCorp, the old
company, that stock was liquidated and new stock was issued for the new
GenCorp, as well as the same amount for Omnova Solutions.

*Id.* at 109-110. When testifying regarding the creation of Omnova, Mr. May stated:

Q: ... The spin-off of GenCorp, from Omnova to GenCorp, Omnova maintained
all of the facilities in Jeannette; correct?
A: Yes.
Q: The GenCorp's facilities became the Omnova facilities?

7

A: In Jeannette.

Q: Yes?

A: Yes.

Q: The GenCorp employees became the Omnova employees in Jeannette?

A: Yes.

Q: And the officers of the company GenCorp, the officers of GenCorp became Omnova officers; didn't they?

A: The CEO moved from GenCorp to Omnova. Others, staff people, I'm – not sure.

. . .

Q: John Yasinsky was chairman of the board? Do you know him?

A: CEO; yes.

Q: And he became chairman and CEO of GenCorp?

A: Chairman and CEO; yes.

Q: He became chairman, CEO of Omnova?

A: Of Omnova. Yes.

Q: Kevin McMullen, do you know him?

A: Yes.

Q: Kevin McMullen was the chief operating officer and still is of Omnova, correct?

A: Kevin, I believe is the CEO at this point.

Q: And he's served as vice president of GenCorp and president of GenCorp's decorative and building products; didn't he?

A: He was.

Q: And then there was a Michael Hicks. Do you recall that name?

A: I believe Mike Hicks was in finance somewhere. I didn't know him personally.

Q: Senior vice president and chief financial officer, treasurer, of Omnova from its formation. He served as senior vice president and chief financial officer and treasurer of GenCorp. Did you know that?

A: I knew he was in finance. I wasn't sure of the title.

Q: James LeMay was the senior vice president, general counsel, of Omnova and still is; correct?

A: Of Omnova? I thought Jim went - - yes. Jim is with Omnova.

Q: And he was the assistant general counsel of GenCorp; wasn't he?

A: I believe that's correct.

Q: Nathaniel Mass was the senior vice president, strategic growth, of Omnova; correct?

A: I vaguely remember the name. I'm not sure the title.

Q: And Gregory Roy, senior vice president of human resources of Omnova; right?

A: I don't know that name.

Q: Did you know that he was the human resources person of GenCorp?

A: I don't know that name.

Q: When Omnova came into an existence from GenCorp, the business stayed the same; correct?

A: The products manufactured at Jeannette were the same; yes.

8

Q: Again, the customers remained the same? Employees remained the same?
A: Yes.
Q: And the physical plant remained the same?
A: Yes.
Q: And the vendors and contractors that Omnova used were the same ones that GenCorp used at that facility?
A: Yes.
Q: Waste Management? That kind of thing; correct?
A: Correct.
. . .
Q: . . . Were you aware that Omnova agreed to undertake the liabilities of GenCorp at the Jeannette facility?
A: I - - yes. I'm sure that Omnova undertook liabilities at Jeannette.

*Id.* at 111-116.

Along with Mr. May's testimony, the plaintiff introduced into evidence Omnova's 10K report to the Securities and Exchange Commission ("SEC") as required by the Security and Exchange Act of 1934. *See* 11/7/2012 Trans. [ECF No. 108] at 222. The 10K report also included a Distribution Agreement dated September 30, 1999, which included terms and conditions regarding the creation of Omnova from GenCorp. As plaintiff asserts:

The 10K recites the history of the Omnova/GenCorp/General Tire relationship and the terms and conditions of the spinoff. The 10K lists Omnova's officers and the intimate relationship between Omnova and GenCorp. For example, the 10K lists Omnova's nine Executive Officers as Item 4A including Chairman of the Board, Chief Executive Officer, President and Chief Operating Officer, four senior vice presidents, two vice presidents and a secretary *all of whom previously worked for GenCorp*. The 10K also was evidentiary of the common identity of officers, directors and stock between Omnova and GenCorp as well as the fact that Omnova merely continued the business operations of GenCorp. The 10K also indicates that many of the GenCorp employees transitioned to Omnova, Defendant Omnova maintained the same assets and business operations as GenCorp and held itself out to the public as a continuation of GenCorp.

Pl.'s Br. in Supp. of Resp. to Mot. [ECF No. 115] at 9 (emphasis in original). Thus, Mr. May's testimony along with the SEC 10K filing and the Distribution Agreement submitted into evidence and given to the jury to consider in their deliberations was sufficient evidence for the

jury to make a determination on the mere continuation claim. Therefore, the Court will not disturb the jury's finding, and defendant's motion on this ground is denied.

### d. Causal Connection

Defendant argues that plaintiff failed to prove a causal connection between the culvert's maintenance and the flooding sustained at plaintiff's insured's building. Defendant argues that plaintiff's expert witness, Dr. Roger Ruggles, did not give his expert opinion with the requisite degree of certainty that Pennsylvania law requires. Dr. Ruggles was asked to opine whether following the recommendations of a hydrologist to excavate the culvert would have mitigated the flood damage. He responded: "I believe that there would be a possibility that the flooding would have been potentially eliminated in both the OMNOVA building and the Mafcote building." Pl.'s Br. in Supp. of Mot. for Post Trial Relief [ECF No. 113] at 10 (quoting 11/7/2012 Trans. [ECF No. 108] at 173-74.

"In determining whether the expert's opinion is rendered to the requisite degree of certainty, we examine the expert's testimony in its entirety." *Vicari v. Spiegel*, 936 A.2d 503, 510 (Pa. Super. Ct. 2007). Pennsylvania's rule as to the requirement of expert testimony are "a matter of substantive law governing a plaintiff's burden of proof[,]" *Redland Soccer Club, Inc. v. Dept. of Army of United States*, 55 F.3d 827, 852 (3d Cir. 1995) and "thus governs in federal court." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 752 (3d Cir. 1994).

Dr. Ruggles' statement that he "believed that there would be a possibility that the flooding would have been potentially eliminated" had Omnova followed the recommendations of a hydrologist is cited by Defendant out of context. Defendant would have this court view Dr. Ruggles' statement in a vacuum and find that he gave no testimony with the degree of certainty required by an expert as to causation. Notwithstanding this one statement made by Dr. Ruggles

10

about mitigating the flooding, Dr. Ruggles provided expert testimony as to the causation of the flood with respect to the culvert within a reasonable degree of scientific certainty. *See* 11/7/2012 Trans. [ECF No. 108] at 86.[3] Dr. Ruggles testified that the culvert was undersized[4] and that it was negligently maintained[5]. *See* 11/7/2012 Trans. [ECF No. 108] at 86, 126-27. In support of his contentions, Dr. Ruggles, stated that the negligent maintenance occurred because defendant failed to follow its insurance carrier's suggestions to excavate the right bank of Brush Creek upstream of the culvert, failed to consult a hydrologist,[6] and the culvert was undersized by 17% in violation of applicable statutes, ordinances, plans and drawings that defendant failed to

---

[3]     Dr. Ruggles' testimony reads:

> Q: Did you do an investigation in this case?
> A: Yes, I did.
> Q: Did you come to some conclusions, within a reasonable degree of scientific certainty?
> A: Yes, I did.

11/7/2012 Transcript [ECF No. 108] at 86.

[4]     Dr. Ruggles' testimony reads:

> Q: Okay. And based upon these, this understanding of the dimensions of the culvert, do you have an opinion as to whether it's undersized?
> A: That was my, one of my conclusions that I drew in my report. Yes, it is.

11/7/2012 Transcript [ECF No. 108] at 126.

[5]     Dr. Ruggles stated that the cause of the flooding was "from the culvert itself and/or from debris accumulation within the culvert." 11/7/2012 Trans. [ECF No. 108] at 86.

[6]     Dr. Ruggles' testimony reads:

> Q: Did you have an understanding as to whether or not they had involved a hydrologist?
> A: My understanding is that they did not.
> Q: Is that a problem?
> A: Well, yes. There's, there's just lowering the bank doesn't insure that you get flow. You could lower the bank to an elevation lower than what's downstream and, obviously, no flow is going to occur because it's going to have to go uphill. So, I mean, you need to look at the entire situation, not just go out and dig out the bank and say, okay, we're done. We're below the finished floor elevation of the building.

11/7/2012 Trans. [ECF No. 108] at 173-74.

correct.[7] 11/7/2013 Trans. [ECF No. 108] at 126-27, 172-73.   Considering Dr. Ruggles'
causation testimony as a whole, plaintiff presented sufficient evidence for the jury to find
causation. Further, Plaintiff proved causation through other witnesses. Specifically, Mr. David
Pippert, Omnova's Facility Plant Engineer, testified that he never measured the culvert to
determine whether it complied with the permit issued by the Pennsylvania Department of
Environmental Resources, nor did they consult a hydrologist to confirm the normal flow of
Brush Creek.[8] 11/7/2013 Trans. [ECF No. 108] at 33-34.

Given the breadth of evidence presented by plaintiff regarding causation of the flooding
at its insured's building, defendant cannot demonstrate that the jury verdict was entirely
unsupported by evidence. Accordingly, Defendant's motion for judgment as a matter of law, or
in the alternative for a new trial to this ground is denied.

---

[7]    Dr. Ruggles' testimony reads:

> Q: . . . And comparing the size of the culvert, as you understand it, to the size of the culvert that's
> depicted in the permit, is there a percentage difference?
> A: . . . There's about a - - the culvert is about seventeen percent smaller than what was called for
> in the permit.

11/7/2013 Trans. [ECF No. 108] at 127.

[8]    David Pippert's testimony reads:

> Q: Have you ever, since that time, 2003, hired a hydrologist?
> A: No.
> Q: You were told, again, suggested by F.M. Global after 2003, to hire a hydrologist?
> A: There was, there was a report post-flood.
> Q: Yes?
> A: And then the report, on one of the line items, it said to hire a hydrologist. We went out and
> solicited bids for a hydrologist and we had a series of meetings to discuss what could be done and
> we just came to the conclusion that a hydrologist, because we don't own the property that would
> be affected by that, it would be upstream, and the work would have to be done off of our property.
> So, we got the agencies involved, and we got the DEP involved, and other people, other agencies,
> involved to see if they could help us try to alleviate the problem. And we came to the conclusion
> that we . . . couldn't do anything with the problem from an Omnova standpoint.

11/7/2013 Trans. [ECF No. 108] at 33-34.

## V.     CONCLUSION

For the foregoing reasons, defendant's, Omnova Solutions, Inc.'s, Motion for Post-Trial Relief [ECF No. 101] is denied.  An appropriate Order follows.

Dated: June 18, 2013

By the Court,

The Honorable Cynthia Reed Eddy
United States Magistrate Judge